#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM C. TOMPKINS, )<br>)<br>Plaintiff, )<br>) Civil Action No. 05-311 Erie<br>)<br>v. )<br>)<br>JO ANNE BARNHART, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | |

### MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

      Plaintiff, William C. Tompkins, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security, who found that he was not entitled to supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  Tompkins filed an application for SSI on September 11, 1997, alleging disability due to a hearing loss and depression (Administrative Record, hereinafter "AR", 130-131; 150).  His application was denied, and a hearing was held before an administrative law judge ("ALJ") on January 12, 2000 (AR 85-94; 440-466).  Following this hearing, the ALJ found that he was not eligible for SSI under the Act (AR 33-40).  Tompkins' request for review by the Appeals Council was granted, and the matter was remanded to the ALJ for further consideration of his mental impairments (AR 102-106).

      On remand, the ALJ held two additional hearings on May 5, 2004 and May 12, 2005 (AR 467-505).  On May 26, 2005, the ALJ again found that Tompkins was not eligible for SSI under the Act (AR 19-26).  His request for review by the Appeals Council was denied (AR 8-11), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  The instant action challenges the ALJ's decision.  Presently pending before the Court are cross-motions for summary judgment.  For the reasons set forth below, we will grant Defendant's motion and deny Plaintiff's motion.

## I. Background[1]

Tompkins was born on July 7, 1965, and was thirty-nine years old on the date of the ALJ's decision (AR 20; 130). He has a GED and no past relevant work experience (AR 20; 197).

On May 27, 1993, while incarcerated, Tompkins underwent psychological testing performed by A. Jacobson, Psychological Services Associate I (AR 392-393). Mr. Jacobson reported that based upon his scores, Tompkins' intelligence and intellectual functioning fell within the borderline range of mental ability (AR 392). During the personality testing, Mr. Jacobson found that Tompkins was evasive and misleading during the interview, and proved to be a poor historian (AR 392). Test results indicated that he was a self-centered and non-conforming individual who was socially and emotionally immature (AR 392). His inner controls were weak and impulsivity was a salient feature of his behavior pattern (AR 392). Socially, Mr. Jacobson reported that Tompkins likely avoided extensive interpersonal interaction and interacted on a superficial level (AR 393). He found his prognosis of institutional adjustment guarded, and recommended a highly structured unit with limited decision making (AR 393).

Tompkins underwent an initial psychiatric evaluation conducted by Craig Richman, M.D. of Community Integration on September 22, 1997 (AR 243-244). Tompkins reported an extensive criminal history with numerous years in jail (AR 243). He complained of anxiety, depression, isolation and poor sleep (AR 243). Dr. Richman reported that Tompkins was abused as a child, both physically and sexually, and suffered from hearing problems due to being hit with a bat as a child (AR 243). Tompkins was able to read lips and had no trouble communicating (AR 243). Past substance abuse included alcohol and marijuana (AR 243). On mental status examination, Dr. Richman reported that Tompkins admitted being anxious and depressed with feelings of hopelessness, and that he felt he had too much time on his hands (AR 244). Tompkins lived alone and had no family support, but did have a girlfriend (AR 243). Dr. Richman found his judgement was somewhat impaired (AR 244). Tompkins was diagnosed with

---

[1]Our recitation is limited to the medical evidence regarding his alleged mental impairments since Tompkins does not challenge the ALJ's decision with respect to his alleged physical impairments.

major depression, polysubstance abuse, and antisocial personality (AR 244). Dr. Richman assigned him a Global Assessment of Functioning ("GAF") score of 40, and prescribed Remeron (AR 244).[2]

On November 19, 1997, Manella Link, Ph.D., a state agency reviewing psychologist, completed a mental residual functional capacity assessment form and concluded that Tompkins was not significantly limited or only moderately limited in all areas of functioning (AR 256-259).

On May 27, 1999, while incarcerated at SCI-Albion following a second technical parole violation, Tompkins was evaluated for parole purposes by Deborah J. Gregg, Psychologist (AR 390-391). Tompkins reported that there were times he became "a little depressed," but he did not feel that way anymore (AR 390). He was compliant with his medications and denied alcohol use (AR 390). Ms. Gregg noticed no outward signs of depression, and found that his diagnosis of depression appeared to be in "good remission" (AR 391).

Tompkins was again psychiatrically evaluated for parole purposes by Angela Lindemuth, D.O., on September 3, 1999 (AR 386-389). He reported a history of physical and sexual abuse by his parents and while in foster care (AR 386). He suffered from hearing loss in both ears as a result of a rupture of the tympanic membrane bilaterally due to a beating from his father (AR 387). He was reportedly intoxicated on various substances on a daily basis well into his twenties until his incarceration, and had been hospitalized on five different occasions from adolescence through his early adulthood for suicidal attempts (AR 386). He further reported that he engaged in self-mutilation since the age of 14, and had jumped in front of vehicles on multiple occasions (AR 386). He was the father of five children mothered by various women (AR 386).

Dr. Lindemuth found that Tompkins appeared to exhibit a borderline personality type profile, and since his teenage years, had exhibited extreme mood reactivity, temper displays, recurrent suicidal ideation, threats, and suicidal gestures (AR 387). Tompkins described a

---

[2]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Scores between 31 and 40 indicate that an individual has "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work[.]"). *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

significantly variable self-image, transient paranoid ideation, feelings of emptiness, and vacillated from valuing to devaluing others (AR 387). Dr. Lindemuth observed that Tompkins' updated psychological report indicated that he had adjusted quite well to the institution, was compliant with his medication treatment and group programming, and was looking forward to entering the Stairways program upon release (AR 387).

On mental status examination, Dr. Lindemuth reported that Tompkins exhibited poor grooming and hygiene and had a level of unkemptness (AR 388). Although he had difficulty hearing, he was able to relate in a cooperative and candid fashion, and articulated clearly and spontaneously in an organized goal-directed thought process (AR 388). His thought content varied depending upon the subject matter addressed, and his affect appeared somewhat blunted but euthymic (AR 388). Dr. Lindemuth found no evidence of perceptual disturbance or delusional ideation (AR 388). Although Dr. Lindemuth found his judgment lacking given his persistent criminal behavior despite the consequences, he exhibited some insight with respect to his illness since he was cognizant of the need to maintain follow up with mental health care treatment to perpetuate mental stability (AR 388). Tompkins was diagnosed with recurrent but currently stable major depression, polysubstance abuse, and borderline personality disorder, and assigned a GAF score of 45 (AR 388).[3] Dr. Lindemuth opined that there were no clinical contraindications to granting parole, and recommended Tompkins for the Stairways program (AR 389).

Pursuant to the request of the Commissioner, Tompkins underwent a consultative psychological evaluation on February 16, 2000 performed by Byron Hillin, Ph.D. (AR 277-281). At the time of the evaluation, Tompkins was residing in a residential drug and alcohol program run by Stairways Mental Health, Inc. as part of his conditions of parole (AR 277). Tompkins reported that he had difficulty sustaining work due to his suspiciousness and paranoia, and had been dismissed from his last job because of his paranoia (AR 278). He indicated that he had never been married, but had six children for whom he paid no child support (AR 279).

---

[3]Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*.

Tompkins recounted his prior abuse by his father, as well as his prior criminal history (AR 279). He reported that he did not drive, had never lived alone, and had always had other people assist him with cooking and cleaning (AR 279). He denied any hobbies, but attended Alcoholics Anonymous meetings on occasion (AR 279). His medications included Remeron and Risperdal (AR 277).

On mental status examination, Dr. Hillin found Tompkins' hygiene and dress were adequate, eye contact was appropriate, and he developed rapport easily (AR 279). Tompkins claimed that at times he was depressed with feelings of hopelessness regarding his future, became anxious around other people, suffered from paranoia which he felt contributed to his inability to hold a job, and had difficulty sleeping (AR 280). Dr. Hillin reported that his speech was relevant, coherent and goal-directed, his thoughts were well-organized, no psychotic symptoms were present, and his affect was normal (AR 280). Tompkins' attention and concentration were adequate, his memory processes were intact, and his social judgment was appropriate (AR 281). Dr. Hillin diagnosed him with alcohol and substance abuse in remission, depressive disorder NOS by history, and antisocial personality disorder features (AR 281). Dr. Hillin assigned him a GAF score of 55,[4] and opined that he could follow simple directions and was capable of independent functioning (AR 281).

Dr. Hillin also completed a residual functional capacity assessment form and opined that Tompkins had a "fair" ability in most areas of functioning, except in his ability to understand, remember and carry out complex job instructions, which Dr. Hillin found was "poor/none" (AR 282).

Tompkins was evaluated by David Thomas, Ph.D. from Stairways Behavioral Health on February 26, 2000 (AR 307-318). He reported that he had been off his medications for the last four days, and complained of feeling overwhelmed, hopeless, worthless, and paranoid (AR 308). He reported that he last worked one month earlier for a seven-month period pumping gas, and left that job because he was not given enough hours (AR 312). On mental status examination,

---

[4]A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*.

Dr. Thomas reported that Tompkins was cooperative, exhibited adequate eye contact, hygiene and dress (AR 314). His speech was pressured, his affect appropriate, and his thought process was organized and relevant (AR 314-315). He had above average intellect, and his long term memory, motivation, judgment and insight were fair (AR 315). Dr. Thomas diagnosed post traumatic stress disorder, depression NOS,[5] antisocial personality disorder, borderline personality disorder, and assigned him a GAF score of 50 (AR 315). Dr. Thomas resumed his medications (AR 315).

Medication-check progress notes dated April 13, 2000 reflect that Tompkins complained of poor sleep and poor concentration, although he reportedly read a lot (AR 306). Tompkins reported that he never received his medications since he lost his prescription (AR 306). His appearance, speech, judgement, insight and memory were all reported as normal (AR 306). On May 10, 2000, Tompkins complained that he felt more depressed, with mood swings and anxiety (AR 305). He further reported feelings of helplessness and anger (AR 305). Effexor was added to his medication regime (AR 305).

On June 2, 2000, Larry D. Smith, Ph.D., a state agency reviewing psychologist, completed a mental residual functional capacity assessment and opined that Tompkins was not significantly limited or only moderately limited in most areas of functioning, and there was no evidence of any limitation in his ability to understand, remember and carry out detailed instructions (AR 346-347). Dr. Smith further opined that despite his difficulties interacting with people and his over-sensitivity to their behavior, Tompkins had the ability to understand, remember and follow instructions and perform at least routine tasks (AR 348).

On September 4, 2001, while incarcerated at SCI-Somerset, he underwent a psychiatric evaluation for parol conducted by Pushkalai Pillai, M.D. (AR 381-383). Tompkins relayed his prior criminal history and physical abuse history, and stated that he was unable to provide support for his seven children (AR 381-382). On mental status examination, Dr. Pillai reported that Tompkins was somewhat unclean and unkempt, but was cooperative, "very calm," friendly,

---

[5]"NOS" stands for "not otherwise specified," and includes disorders with depressive features that do not meet the criteria for other specific categories of depression set forth in the DSM-IV-TR. *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 381 (4th ed. 2000).

and exhibited a normal affect with no anxiety (AR 382).  His speech was respective, spontaneous, relevant, coherent and logical (AR 382).  Dr. Pillai found no evidence of psychosis, depression or suicidal thoughts (AR 382).  Dr. Pillai further found that Tompkins' judgment had improved, but his capacity for judgment when not under supervision was questionable (AR 383).  He was diagnosed with adjustment disorder with depressed mood and personality disorder, mainly borderline personality disorder, which was the principle diagnosis (AR 383).  Dr. Pillai found no psychiatric contraindications for parole, but opined that he should undergo placement in a drug and alcohol program with mental health follow up, and that he needed supervision for an extended period of time due to his poor judgment and limited intellectual functioning (AR 383).

     Dr. Pillai conducted another clinical risk assessment for parole on March 12, 2002 (378-380).  Dr. Pillai reported that Tompkins appeared "much different" when last seen for parole evaluation in September 2001 (AR 379).  He was clean, friendly, cooperative and pleasant (AR 379).  He was calmer, with no anxiety or depression, and his speech was spontaneous, relevant and coherent (AR 379).  His affect was appropriate to his thought content, and he had no suicidal thoughts (AR 379).  Dr. Pillai found that Tompkins exhibited a positive attitude regarding his life when released from prison, and was concentrating on finding a job upon his release  (AR 379).  He was diagnosed with depression NOS and personality disorder, mainly borderline personality and antisocial personality disorder, and assessed with a GAF score of 60 (AR 379).  Dr. Pillai found no psychiatric contraindications for parole, but opined that he should be placed in a supervised halfway house with mental health follow up, as well as drug and alcohol testing (AR 380).

     Subsequent to his release from prison, Tompkins underwent an initial psychiatric evaluation on July 7, 2004 conducted by Kripa S. Singh, M.D., of Safe Harbor Behavioral Health (AR 434-436).  Tompkins reported previous treatment at Stairways Behavioral Health which had been discontinued due to logistical problems (AR 434).  He complained of depression, poor sleep, and the urge to engage in self-mutilating behavior (AR 434).  On mental status examination, Dr. Singh reported his speech was within normal limits and his thought processes were organized, relevant, coherent, logical, rational and goal-directed (AR 435).  Tompkins claimed that he felt people were trying to "get" him, and Dr. Singh reported that he had frequent

ideas that people talked about him or made fun of him (AR 435). Tompkins further claimed that he often felt that there was "someone standing there who [was] not there," and that at times he heard someone calling his name (AR 435). He reportedly felt anxious, nervous, and jittery, and was often sad and depressed (AR 435). Although he felt helpless and worthless, he had no active suicidal thoughts or plans (AR 436). Dr. Singh found that he appeared to be of average intelligence, had no difficulty understanding the concepts behind the rationale of treatment, appeared motivated to seek treatment, and showed fairly good insight (AR 436). Tompkins was diagnosed with major depression, recurrent, with psychotic features, generalized anxiety disorder, and borderline personality disorder, and assigned a GAF score of 50 (AR 436). Dr. Singh recommended a combination of antipsychotics, antidepressants and anxiety drugs, and supportive psychotherapy (AR 436).

Tompkins was seen by Lynn Taylor, PA-C, from Safe Harbor Behavioral Health on March 3, 2005 for a routine medication check and reported that he had been off his medications for six months (AR 427). Ms. Taylor noted that he had not been seen since July 2004 (AR 427). He complained of periods of deep depression and hyper episodes, claiming he did not sleep for days and "took off" out of Erie (AR 427). Ms. Taylor reported that his appearance was within normal limits with good hygiene (AR 427). His mood and cognition were within normal limits, and he was pleasant and cooperative (AR 427). Ms. Taylor restarted his medications, and referred him to individual therapy (AR 427). She assigned him a GAF score of 50 (AR 427).

On April 11, 2005, Tompkins returned to Ms. Taylor and reported that he did not take his medications since he was unable to afford them (AR 426). He complained of depression, hyper episodes and cutting behavior, but Ms. Taylor observed no fresh scars (AR 426). He also complained of panic attacks and post traumatic stress disorder secondary to incarceration (AR 426). Ms. Taylor reported that Tompkins was organized, with no evidence of mania or hypomania, and his thought process and affect were normal (AR 426). She changed his medication, and assigned him a GAF score of 50 (AR 426).

Finally, on April 12, 2005, Ms. Taylor wrote Tompkins' attorney stating that he had received treatment through Safe Harbor Behavioral Health for major depression, generalized anxiety disorder and borderline personality disorder (AR 425). This letter was also signed by

Ralph Walton, M.D. (AR 425). Ms. Taylor stated that Tompkins suffered from mood instability, impulsivity, panic attacks and self-mutilating behavior (AR 425). With regard to his work-related abilities, she opined that Tompkins' ability to maintain concentration and attention was fair, and his ability to maintain long-term regular attendance was poor (AR 425). Due to his lack of impulse control, lack of basic coping and life skills, Ms. Taylor further opined that he was unable to respond appropriately to supervisory criticism or interact appropriately with supervisors or co-workers (AR 425).

Tompkins testified at the first hearing held by the ALJ on January 12, 2000 that he was unable to work due to his hearing problems and he did not like to be around a "whole lot of people" (AR 458). He claimed he felt "trapped and caged" as if people were watching him (AR 458). Because he felt people were watching him, he became nervous and made mistakes on the job (AR 458).

At a subsequent hearing held by the ALJ on May 12, 2005 following remand for further consideration of his mental impairments, Tompkins and a Fred Monaco, a vocational expert testified (AR 474-505).[6] Tompkins testified that he lived with a friend who was disabled due to mental issues (AR 482). His friend performed all the household chores, but he helped with the dishes (AR 486). He spent his days watching television or sitting on the porch, and most days avoided people (AR 487; 497-498). Tompkins claimed he did not sleep well, suffered from mood swings and paranoia, and had anxiety attacks every two to three days (AR 487; 495-497). His medication caused drowsiness, but did not help him sleep (AR 488). Tompkins further testified that he was seen by Ms. Taylor at Safe Harbor approximately every two months, and found the counseling sessions annoying (AR 489). He claimed he was unable to work due to depression and an inability to focus (AR 491).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as Tompkins, who was limited to simple, routine, repetitious tasks, with one- or two-step instructions that did not impose strict production quotas, and that required no

---

[6]Prior to this hearing, the ALJ held a hearing on May 4, 2004 (AR 467-473). Tompkins did not appear and only a vocational expert testified (AR 467-473). The ALJ found that he was a non-essential witness, and rendered an adverse decision (AR 19). However, this decision was not issued, and the ALJ decided to hold a third hearing so Tompkins could testify (AR 19; 479).

public contact or more than occasional contact with co-workers or supervisors (AR 502-503). The vocational expert opined that such an individual could perform the jobs of an unarmed guard, janitor or cleaner, and machine feeder (AR 503). The expert further opined that the individual would be expected to respond appropriately to supervisory criticism, behave in an emotionally stable manner, and complete tasks in a timely fashion (AR 504-504).

Following the hearing, the ALJ issued a written decision which found that Tompkins was not eligible for SSI benefits within the meaning of the Social Security Act (AR 19-26). His request for a review by the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 8-11). He subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,*

10

> 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ resolved Tompkins' case at the fifth step. At step two, the ALJ determined that his depression, anxiety, personality disorder, borderline intellectual functioning, substance abuse, in remission, and hearing loss were severe impairments, but determined at step three that he did not meet a listing (AR 20-21). At step four, the ALJ determined that Tompkins had the residual functional capacity to perform work at any exertional level that did not require more than simple, routine, repetitive tasks, with one- or two-step instructions or strict production quotas; further limited by no contact with the public or more than occasional contact with co-workers or supervisors, or greater hearing acuity than that required to be aware of one's surroundings (AR 23). At the final step, the ALJ determined that he could perform the jobs cited by the vocational expert at the administrative hearing (AR 24-25). The ALJ additionally found that Tompkins' allegations regarding his limitations were not entirely credible (AR 25). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Tompkins first argues that the ALJ selectively read the medical evidence and/or ignored certain medical evidence in violation of *Cotter v. Harris,* 642 F.2d 700 (3rd Cir. 1981). Specifically, he argues that the ALJ failed to discuss all of Dr. Singh's findings in his July 7, 2004 evaluation; failed to the 1993 psychological evaluation, Dr. Lindemuth's evaluation on September 27, 1999, and Dr. Pillai's evaluation performed on September 4, 2001.

Consideration of all the evidence does not mean that the ALJ must explicitly refer to each and every finding contained in a report. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3rd Cir. 2001) (ALJ not required to discuss every treatment note). Moreover, the failure of an ALJ to cite specific evidence does not necessarily establish that such evidence was not considered. *Phillips v. Barnhart*, 91 Fed.Appx. 775, 777 n.7 (3rd Cir. 2004); *Lozada v. Barnhart*, 331 F. Supp. 2d 325, 336 (E.D.Pa. 2004). Indeed, requiring an ALJ to exhaustively address each and every finding in the record would prove too burdensome. As long as the ALJ "articulates at some minimum level

[his] analysis of a particular line of evidence," a written evaluation of every piece of evidence is not required. *Phillips*, 91 Fed.Appx. at 777 n.7.

      Here, we find that the ALJ's consideration of the medical evidence was consistent with this standard. With respect to Tompkins' claim that the ALJ failed to explain his apparent disregard of Dr. Singh's diagnosis that his depression included psychotic features and that he had multiple and frequent ideas of self reference, a review of the ALJ's decision reveals that he was aware of Dr. Singh's findings since they were specifically discussed in his decision (AR 21). The ALJ observed that Dr. Singh diagnosed Tompkins with depression with psychotic features, and that he reportedly heard voices and claimed that people were trying to get him (AR 21). The ALJ noted however, that Dr. Singh found his thought processes were organized, and that the record failed to demonstrate that his hallucinations would prevent the performance of simple, low-stress tasks (AR 22). Moreover, we observe that although Dr. Singh found Tompkins had ideas of self reference, he found that he was not frankly delusional and had fairly good contact with reality around him (AR 435).

      Tompkins further claims that the ALJ erred in failing to discuss his apparent rejection of his assessed GAF score of 50, which is indicative of serious symptoms. In essence, Tompkins appears to argue that such score indicates an inability to work and the ALJ should have explained why he rejected this evidence. The GAF score is used by clinicians to report an individual's overall level of functioning. *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV* 32 (4th ed. 2000). It is intended to be used to make treatment decisions, and "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." Wilkins v. Barnhart, 69 Fed.Appx. 775, 780 (10th Cir. 2003). GAF scores alone, however, do not evidence an impairment seriously interfering with a claimant's ability to work. *See Lopez v. Barnhart*, 78 Fed.Appx. 675, 678 (10th Cir. 2003). Moreover, "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002). While Tompkins' score of 50 may indicate an inability to hold a job, it does not compel that conclusion. *See Hillman v. Barnhart*, 48 Fed.Appx. 26, 30 n.1 (3rd Cir. 2002) (a GAF score of 50 indicates claimant could perform some substantial gainful activity). The ALJ's

decision reveals that although he did not explicitly reject Dr. Singh's assessment of Tompkins' GAF score, he nonetheless considered this score in connection with all of Dr. Singh's findings (AR 21). We also note that the ALJ observed that notwithstanding the GAF score of 50, Dr. Singh found that Tompkins' behavior, mood, affect and cognition were within normal limits (AR 21).

We further reject Tompkins' argument that the ALJ erred in failing to discuss his 1993 psychological evaluation, Dr. Lindemuth's 1999 evaluation and Dr. Pillai's 2001 evaluation. The 1993 psychological evaluation is of limited value since it occurred twelve years prior to the administrative hearing. Likewise, any failure to specifically mention Dr. Lindemuth's 1999 evaluation or Dr. Pillai's 2001 evaluation does not dictate remand. Tompkins faults the ALJ for failing to mention Dr. Lindemuth's finding that Tompkins' severe mood reactivity, anger dyscontrol, impulsivity and self-mutilation were the result of his borderline personality disorder, and Dr. Pillai's diagnosis of borderline personality disorder with certain risk factors. *Plaintiff's Brief pp. 18-19.* However, disability is determined not by the mere presence of impairments, but rather by the functional restrictions placed on an individual by those impairments. *See Jones v. Sullivan*, 954 F.2d 125, 129 (3rd Cir. 1991).

Here, Dr. Lindemuth's evaluation and Dr. Pillai's evaluation are of limited significance, since both evaluations were performed in connection with Tompkins' parole, and did not address any work-related functional limitations. Notwithstanding their limited significance, a review of these evaluations do not support Tompkins' claim that he is precluded from working. Dr. Lindemuth found that Tompkins spoke clearly and spontaneously in an organized goal-directed thought process, and had no evidence of perceptual disturbance or delusional ideation (AR 388). She further found that he had adjusted "quite well" to the institution, was compliant with his medication regime, and was looking forward to his release (AR 387). Two years later when evaluated by Dr. Pillai in September 2001, Tompkins was "very calm," friendly, and exhibited a normal affect with no anxiety (AR 382). Dr. Pillai found no evidence of psychosis, depression or suicidal thoughts, and noted that his judgment had improved (AR 382-383). We therefore find no error in this regard.

Tompkins also challenges the ALJ's rejection of Ms. Taylor's opinion of April 12, 2005.

Ms. Taylor opined that his ability to maintain concentration and attention was fair, his ability to maintain long-term regular attendance was poor, and he was unable to respond appropriately to supervisory criticism or interact appropriately with supervisors or co-workers (AR 425). It is undisputed that Ms. Taylor, as a physician's assistant, is not an "acceptable medical source" whose opinion is entitled to controlling weight. *See* 20 C.F.R. § 416.913(a); *see also Hartranft v. Apfel,* 181 F.3d 358, 361 (3rd Cir. 1999) (holding chiropractor's opinion not entitled to controlling weight under treating physician rule). Nonetheless, an ALJ may consider a physicians' assistant's opinions, along with other evidence, in assessing a claimant's disability. *See* 20 C.F.R. § 416.913(e)(3). Here, the ALJ explicitly considered Ms. Taylor's opinion concerning Tompkins' disability, but concluded that her opinion did not require a finding of disability since she was not an acceptable medical source and her opinion was contradicted by earlier and more recent treatment records (AR 21-22).

A review of the medical evidence reveals that Ms. Taylor's opinion was contrary to Dr. Hillin's February 2000 opinion that Tompkins had a "fair" ability in most areas of functioning, could follow simple directions, and was capable of independent functioning (AR 281). Her opinion was inconsistent with Dr. Pillai's findings in March 2002 that Tompkins' mental condition had actually improved, in that he was calmer, with no anxiety or depression, his speech was spontaneous, relevant and coherent, he exhibited a positive attitude regarding his life upon release from prison, and was concentrating on finding a job (AR 379). Her opinion was also at odds with Dr. Singh's findings in July 2004 that Tompkins' thought processes were organized, relevant, coherent, logical, rational and goal-directed (AR 435).

Moreover, we observe that Ms. Taylor's opinion is inconsistent with her own treatment notes. In March 2005, she reported that his mood and cognition were within normal limits, and he was pleasant and cooperative (AR 427). On April 11, 2005, the day before she rendered her opinion, Ms. Taylor reported that Tompkins was organized, with no evidence of mania or hypomania, and his thought process and affect were normal (AR 426).[7] Accordingly, we find no

---

[7]Tompkins also argues that there are factual errors in some of the ALJ's findings with respect to the Safe Harbor Behavioral Health records. For example, the ALJ recites the date of the first treatment record as March 2005 and Tompkins claims the date is actually February 3,

error in the ALJ's evaluation of Ms. Taylor's opinion.

Finally, Tompkins claims that the ALJ erred in finding his testimony not entirely credible. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 416.929(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983). In his assessment of Tompkins' credibility, the ALJ found that his testimony regarding his functional limitations were not entirely credible (AR 25). We have reviewed the ALJ's assessment of credibility and find it entirely consistent with the standard set forth above.

### IV. Conclusion

An appropriate Order follows.

---

2005 as evidenced by the attendance records. By way of further example, the ALJ recites that Dr. Singh made certain findings, when in fact Ms. Taylor did. However, the ALJ did note that the signature was not totally legible (AR 21). While Tompkins may be correct, we find that any factual errors in this regard were *de minimus* and non-material.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM C. TOMPKINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-311 Erie |
| ) | |
| v. ) | |
| ) | |
| JO ANNE BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

AND NOW, this 13th day of July, 2006, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 9] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 12] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, William C. Tompkins. The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.